## ARKANSAS SAVINGS AND LOAN ASSOCIATION BOARD v. CORNING SAVINGS AND LOAN ASSOCIATION

5-6088                                                    490 S.W. 2d 460

Opinion delivered February 12, 1973
[Rehearing denied March 12, 1973.]

*Kenneth E. Suggs,* for appellant.

*Smith, Williams, Friday, Eldredge & Clark, by: William L. Terry,* and *Scott Manatt,* P. A., for appellee. appellee.

CONLEY BYRD, Justice. Appellee, Corning Savings and Locan Association filed an application with appellant, Arkansas Savings and Loan Association Board for charter to operate a savings and loan association. Appellee's ap-

plication was resisted by the Pocahontas Federal Savings and Loan. The latter, a federally chartered association had pending a federal application for a branch office at Corning. The Board found that appellee had met all the requirements for a charter except the showing required by Ark. Stat. Ann. § 67-1824 (3)—*i.e.*, "There is a public need for the proposed association and the volume of business in the area in which the association will conduct its business is such as to indicate a successful operation." The trial court reversed the three to two decision of the Board. On this appeal the Board contends that the trial court erred in finding that the decision of the Board was not based on substantial evidence.

To support its position the Board primarily relies upon the cross-examination of Dr. Barton Westerlund, an economist, Sam L. Manatt, Jr., a banker, and Mr. Carl Lacy, an accountant.

Dr. Barton A. Westerlund, an economist employed by the University of Arkansas' Industrial Research and Extension Center testified to the growth of the City of Corning and the immediate surrounding area. Not only was there a population increase in the Corning area, as compared to a total County decrease of 11.7% for the period of 1960 to 1970, but other statistics showed a substantial increase in the average standard of living in the area. Electrical consumption was up 43%; agricultural employment had dropped from 2,150 to 1,450 persons while nonagricultural employment had increased from 3,575 to 4,575 persons. The Darling Company plant then under construction would add another 400 employees. According to his estimate the annual manufacturing employment payroll would increase from $2.5 million to $4.3 million when the Darling plant got into full production. In Corning proper there were 150 mortgages per year with an average value of $978,526.00. Dr. Westerlund estimated the average would go to $1,208,000.00. On cross-examination Dr. Westerlund admitted that for Clay County as a whole there was a decline in population for the period from 1960 to 1970.

F. B. Manatt, an Executive Vice President of the Corning Bank and a former State Representative, testified that there was a shortgage of rental property in

Corning. He estimated that there was an average of three speculative residential homes per month being built in Corning and an average of two per month being built under contract. The bank deposits in the Corning Bank had increased by one million each year for the last few years. With respect to the need of a savings and loan and the service being performed by the savings and loan associations at Pocahontas, Piggot and Paragould, Mr. Manatt stated:

> "I'd have to say that there's two types of loans, the loans anybody would make; and the loans that you have to have an interest in the people or know something about them to make. This first class of loans has probably been taken care of. I'm talking about people starting out without credit; they've both got good jobs. These are the people I don't think are being served."

On cross-examination Mr. F. B. Manatt testified as to referrals they had made to other savings and loan associations. He estimated that during the first year of operation appellee would make home mortgage loans in the range of one million dollars. He estimated that during the last year there were home mortgage loans in the Western District of Clay County amounting to $2.4 million.

Daniel B. Howard, a certified public accountant with saving and loan auditing experience, estimated that upon a volume of $1.1 million in loans, appellee would make a profit the first year. Based upon the economic facts that he had been presented, he testified that in his opinion he had no question about the success of appellee. On cross-examination he admitted that his first year estimate was based upon an 8½% interest rate and that a 7½% rate would make a difference.

Sam L. Manatt, Jr., Executive Vice President of Corning Bank testified that there was a definite need for a savings and loan in Corning. His bank's time deposits had jumped about three quarters of a million dollars in the last few months. He stated that the shoe plant employed 350 people and Basler Electric around 150. Both plants had expanded about two years ago. While acknowledging that he knew of no one who had

been denied a home loan for lack of money, he described the house construction in Corning as a slow growth process.

Dr. Louis M. Amis, a member of North American Research and Development Corporation concurred in Dr. Westerlund's appraisal. He pointed out that it is unusual to expect any kind of profit from the first year operation of a savings and loan institution. He stated that it would take from one to three years to reach a break even point in such an operation. He estimated that there would be an additional demand of $1,000,000.00 for home loans in the Corning area.

Carl Lacy, a C. P. A. with E. L. Gantt & Co. took the estimated expenses of appellee as given by Daniel B. Howard and after reducing that interest rate from 8½% to 7½% and adjusting other items of expense arrived at an estimated losss of $6,000.00 for appellee's first year operation. In addition he estimated that a branch office could be operated more economically and more efficiently than a brand new association. On cross-examination, Mr. Lacy stated that his projected loss of $6,000.00 for the first year was not vitally significant regarding first year operation.

Mr. Joe Martin, President and Manager of Pocahontas Federal Savings and Loan testified that they had a branch office at Walnut Ridge which was very successful. His bank had $897,831.00 of deposits in 1971, from the Western District of Clay County. During the same time his association loaned $1,940,394.00 in the same area. On cross-examination he stated that one reason his association wanted a branch office at Corning was that the business is good. The other reason was to better service the area. In his opinion the Corning trading area was as good as the Walnut Ridge trading area. He described them as similar.

Vernon King, the Vice President and Secretary and acting general counsel of Pocahontas Federal Savings and Loan, testified his association made home loans in the Western District of Clay County for the year of 1968, in the amount of $725,000; for 1969 in the amount of $940,000, and for 1970 in the amount of $1,326,000. He

estimated his association's proposed branch could made an additional $1,000,000 of outstanding loans at the end of three years operation. On cross-examination, he stated that in his opinion the community of Corning was a growing community very similar to Pocahontas and Walnut Ridge. According to him the whole area was going from a completely agricultural to a little more balanced economy. He also stated that he could not recall a foreclosure in the Corning area and that his association had never had a loss in principal and interest.

F. B. Manatt, upon rehearing, testified that Corning's city budget had grown from $57,000 in 1963 to $140,000 plus in 1971. In 1955 there were 499 sewer and water connections and that in 1970 there were 1050. The gross income of the post office had grown from $9,160.40 in 1959 to $24,228.27 in 1971. The number of telephones had increased from 906 in 1960 to 1629 in 1971. The Corning Bank's demand deposits had grown from $3.3 million in 1960 to 5.8 million in 1970. During the same period, time deposits had grown from $705,000 to $3.3 million.

E. W. Cochran, Mayor of Corning, pointed out that there were five supermarkets in Corning.

Bill Block, President of First Federal Savings and Loan of Paragould, testified as follows:

"As far as the economic success is concerned, I think perhaps I may be better able to answer that question than some of you because I have worked in and been a part of a very small savings and loan association. I want to give you some facts and figures in just a minute, but this leads me to believe it can be a success.

"I wouldn't be so candid as to try to influence you gentlemen that this is going to be a huge financial success over night. It's going to become a multi-million dollar association. I do not believe that. I believe they are going to have their problems just like the rest of us have had ours. I think they have their heads above water. It's a proven fact they have the support of their community, and I believe they can be successful.

"I would like to point out some figures to you that I took from our annual report of 1962. This was the December, 1962, report of the First Federal Savings and Loan of Paragould. We had at the time a total of 264 mortgages for $1,285,000.00 and that's all. We had depositors and our total deposits numbered 382. I was a little embarrassed to find out they are going to have almost that much at their opening. Our total deposits were $1,591,000.00. I give you those figures only to show you the nets that I think are the important ones.

"That year our gross operating income was $89,000.00 and our expenses were — and I have rounded these figures, gentlemen, so they will be easier — approximately $11,000.00. Our federal income tax was a thousand. We paid interest to our depositors which at that time was called dividends of $61,000.00. But we transferred to our reserves an undivided profit of $16,000.00. Now $16,000.00 for a total association of a million and a half to be transferred into reserves and so forth is not bad. We are still small, but we're growing.

"I'd hate to go back to those days, but they are just beginning. They haven't been there and they don't know, but they can make it and I know they can because I've been there. Our association has been there.

"Many of the witnesses that have been testifying in favor of it have talked about, in effect, the population explosion. What are we, a country of 300 million now and there's supposed to be another hundred million people by 1985 or something like this? People don't want to live in the cities now. I'm not talking about the cities of Arkansas; I'm talking about Detroit and Philadelphia. Civil unrest and these type of things. They are moving. This is why Corning is able to get factories in here; why L. A. Darling has branched out and why the other one Mr. Manatt referred is possibly coming to Corning. They want a clean and decent town to raise their children in, and I don't blame them. I'm tickled to death to live in the one that I live in."

Appellant here takes the view that the economy of the Corning area is expanding at a much slower rate than the economy of Arkansas generally and that the area has a high number of lower income persons, who may not have sufficient down payment for a new home or the requisite credit rating necessary to qualify for permanent financing. Based upon the foregoing premise, appellant expresses the opinion that a new association cannot cope with these problems any better, or perhaps not as well, as the present savings and loan associations in the area.

We cannot find any substantial evidence to support appellant's position or findings. As we view the record it stands as uncontroverted; that the economy was changing from a completely agricultural to a little more balanced economy similar to Pocahontas and Walnut Ridge; that the Darling Company plant was moving into the area with a potential employment of 400 persons; and that the savings and loan associations with experience in the area wanted a local branch office to serve the needs of the area.

The only other testimony was that of Carl Lacy to the effect that appellee would not necessarily operate at a profit the first year. When his testimony on cross-examination—to the effect that the first year loss was not vitally significant—is considered along with the undisputed testimony that it takes from one to three years to realize a profitable operation and that of Bill Block as to the profits his organization had made under similar circumstances, we cannot say that there was substantial evidence to show that the volume was insufficient to support a successful operation. To the contrary the evidence was all to the effect that the volume was sufficient to support a successful operation.

Furthermore, it has been suggested that the Board's decision could be sustained on the basis that a branch office could be more economically operated than a brand new association. That is not a statutory ground for denying a charter.

Affirmed.

HOLT, J., not participating.

HARRIS, C. J., and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. If it were within the province of either the trial court or this court to weigh the evidence to determine where the preponderance lay, I might well agree with my brethren of the majority. I believe that the only jurisdiction of either court on the review of the board action in this case is to determine whether there was substantial evidence to support the action of the board or whether the board acted arbitrarily. Under Ark. Stat. Ann. § 67-1811 (Repl. 1966), the scope of review of the circuit court is limited to determining whether the findings of the board were supported by substantial evidence. If so, the board's findings are conclusive. *Heber Springs Savings & Loan Association* v. *Cleburne County Bank*, 240 Ark. 759, 402 S. W. 2d 636. Under Ark. Stat. Ann. § 5-713 (h) (Supp. 1971), the circuit court may reverse or modify the decision of the board only if substantial rights of the petitioner seeking review have been prejudiced because its decision was:

(1) in violation of constitutional or statutory provisions;
(2) in excess of the agency's statutory authority;
(3) made upon unlawful procedure;
(4) affected by other error of law;
(5) not supported by substantial evidence of record; or
(6) arbitrary, capricious, or characterized by abuse of discretion.

Thus, in this case, the circuit court's scope of review under this act would be limited to determining whether there was substantial evidence of record to support the board's action or whether the action of the board was arbritrary, capricious or characterized by abuse of discretion. Under § 5-713 (g) the court was limited to a review of the record before the board.

There is no specific provision for appeal to this court in the Administrative Procedures Act. Ark. Stat. Ann. § 5-701, et seq. (Supp. 1971). Under the Savings and Loan Association Act the appeal to this court may be taken as in other civil cases. Ark. Stat. Ann. § 67-1811.

Whichever act is applicable, our general law on review on appeal limits us, in effect, to determining whether there was substantial evidence to support the board's finding. It is not the function of this court, on appeal from the circuit court, to determine where the preponderance of the evidence lies. *Piggott State Bank* v. *State Banking Board*, 242 Ark. 828, 416 S.W. 2d 291. There is nothing in this record to show that the board acted arbitrarily, capriciously or in abuse of its discretion, unless there was a lack of substantial evidentiary support for its findings.

Under Ark. Stat. Ann. § 67-1824 (Repl. 1966), the board, before granting a charter, was required to affirmatively find:

(1) All the prerequisites for the approval of a charter set forth in this act [§§ 67-1801—67-1862] have been complied with.

(2) The character, responsibility and general fitness of the persons named in the articles of incorporation and who will serve as directors and officers of such association are such as to command confidence and warrant belief that the business of the proposed association will be honestly and efficiently conducted in accordance with the intent and purpose of this act and the proposed association will have qualified full-time management.

(3) There is a public need for the proposed association and the volume of business in the area in which the proposed association will conduct its business is such as to indicate a successful operation.

(4) The operation of the proposed association will not unduly harm any other existing association or federal savings and loan association or other financial institution.

The board found that requirements (1), (2) and (4) had been met, but that requirement (3) had not. The scope of inquiry of the circuit court was to determine whether there was substantial evidence in the record of the proceedings before the board to support the board's finding

that it had not been shown that there was a public need for the proposed association or that the volume of business in the area was such as to indicate a successful operation. In regard to the board's action the circuit judge made these findings:

I. That Corning, Arkansas, is located some 25 to 30 miles from any type of financial institution, which would afford opportunity for savings deposits, the bank of Corning offering certificates of deposit, which causes difficulty in convenience and access to financial institutions for the citizenry of the area.

II. The Pocahontas Federal Savings and Loan Association branch office application indicates the reason it desires to establish a branch office in Corning —that is, that there is a considerable volume of savings and loan association business transacted in Corning, and that it felt a definite need for savings and loan association service in Corning.

III. All testimony in the record substantiated that every economic factor governing this type of activity was present in the Corning area, and was evidenced in this community; and that the people of the community were competent, capable, able, aggressive, and were good and honest people with ability to operate such a proposed association.

IV. There is nothing in the record to substantiate the Board's finding that there is no need for a Savings and Loan Association at Corning. Likewise, there is nothing in the record to substantiate the Board's findings that the volume of business in the area is not such as to indicate a successful operation. Therefore, the court finds that the ruling of the Arkansas Savings and Loan Association Board, upon the question of need and adequacy of business in the area as to indicate a successful operation was not supported by substantial evidence of record. To the contrary, the Court finds that substantial evidence of record indicates a definite need for a Savings and Loan Association at Corning, and that it would be successful.

The last sentence of the findings quoted clearly illustrates that the circuit court went beyond the limits of its scope of review and weighed the evidence. I feel that this is the reason that the circuit judge fell into error. The majority does nothing more than point out that there was substantial evidence to support a contrary finding by the board and, thus, justify the trial court's finding in that respect.

On the question of public need, Dr. Barton Westerlund, an economist called by the applicant, testified that he had prepared a report on the area at the applicant's request. On cross-examination, he testified that the increase in per capita income during 1960-1969 was less than that of Clay County in only five counties in Arkansas, that the population of the county had decreased by 11%, and that Corning had a high percentage of homes with low income. Lowell Poyner, a proposed stockholder of the applicant, who was in the real estate business, testified that, in his experience, there had been sufficient funds for home loans, even though there had been from time to time a shortage in commercial funds. Ben Williams, also in the real estate business in Corning, admitted that, in a sense, the needs of the area were being served at the present time, even though he thought that estimates of future housing needs that had been given were conservative. Sam L. Mannatt, Jr., Executive Vice-President of the Bank of Corning, could not think of anyone who had been denied a home loan because of lack of money available for loans.

Joe R. Martin, President of Pocahontas Federal Savings and Loan Association, which had been active in the Corning area, stated that his association had recently reduced their loan interest rates because of a surplus of funds available for making loans. He added that there were four savings and loan associations servicing the area around Corning. He stated that his association had never refused a loan because of lack of funds.

No further elaboration is necessary to show that there was substantial evidence to support a finding that there was not a public need for the proposed institution. There was also evidence indicating that the volume of business which might be anticipated by the applicant was not sufficient to insure its success.

Carl Lacy, a certified public accountant, had considerable experience in accounting work for savings and loan associations. He studied the data submitted in support of the application and found that it was premised on an excessive interest rate of 8½%, and that there was money available for loans of the type that would be made by the new association at 7½%, and that it must be assumed that the applicant would have to meet competition. He also testified that the supporting data was based on prospective interest of 6% on the applicant's funds which would be deposited with the Federal Home Loan Bank when the current rate of interest was only 3½%. He also pointed out that the association would have to pay 7½% interest on money borrowed from the Home Loan Bank rather than 6%, as they had set out in the date submitted with the application. He stated that all the changes necessary to conform this data to the actual conditions would convert the applicant's prediction of a first-year profit of $3,000 to a loss of $6,000. In addition, his experience indicated that estimates of expenses of operation made by the applicant were very conservative and that actual expenses, particularly in an effort to attract deposits, would exceed the estimates.

Vernon King, attorney for and vice-president of Pocahontas Federal Savings and Loan Association, stated that he had made a study of mortgages recorded in the Western District of Clay County. From this and other matters in the record pertaining to deposits and loans related to that district, King made projections of the volume of savings and loans that might be anticipated by a Corning branch of his association. He anticipated a first-year increase of approximately 50% over those currently held by his association and an additional $200,000 in the second year, and a total of $1,000,000 by the third year. He pointed out that the application was based upon a potential $1,100,000 in loans in the first year, of which not more than 20% would be commercial. King testified that it would take three years to reach the anticipated figure, and that would be upon the assumption that such a lending agency already had loans in effect for a part of that total. King anticipated an increase in deposits to his association of $500,000 after a Corning branch was opened. The association already had $897,831 in deposits in the area.

The suggestion that it was inconsistent for Pocahontas Federal Savings and Loan Association to forecast a profitable operation of a branch and simultaneously predict an unsuccessful operation by a new organization will not bear scrutiny. If it is not obvious, there was testimony by Lacy, the accountant, that a branch starts with trained personnel, an established bookkeeping system, lower auditing and management costs, as contrasted with a new organization which must not only establish management and a bookkeeping system, but train personnel and buy supplies and equipment. Furthermore, the record discloses that the application of Pocahontas for a branch was withdrawn between the original board hearing on this application and a rehearing.

I do not know wherein this testimony lacks substantiality. The interest of the witnesses goes only to the question of weight to be given their testimony, a matter solely for determination by the board.

The board before which the hearing was had consited of five members, at least three of whom had not less than two years' experience as an officer or director of a savings and loan association. Ark. Stat. Ann. § 67-1805 (Repl. 1966). In view of the evidence above mentioned and other testimony mentioned in the majority opinion, I submit that both the circuit court and this court have not only weighed the evidence, but have substituted their respective judgments in the matter for the expertise of the members of the board.

I would reverse the judgment and affirm the board.

I am authorized to state that the Chief Justice joins in this dissent.